Victoria Voges BEN–ISSA and Meftah M. Ben-Issa, husband and wife, Plaintiffs,

v.

Ronald Wilson REAGAN, individually and as the President and Chief Executive Officer of the United States; George P. Shultz, individually and as the Secretary of State of the United States, Department of State; Edwin Meese, Attorney General of the United States; William Webster, individually and as the Director of the Federal Bureau of Investigations; and Eli N. Lauderdale, Jr., individually and as the American Consul in Vienna, Austria, Defendants.

No. G86–290.

United States District Court, W.D. Michigan, S.D.

Oct. 22, 1986.

the Equal Protection and Due Process clauses of the Constitution.

Anne Vandermale Tuuk, U.S. Asst. Atty., Grand Rapids, Mich., for plaintiffs.

Behzad Ghassemi, Lansing, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

This case is brought by Victoria Voges Ben-Issa, a United States citizen living in East Lansing, Michigan, and her husband of less than nine months, Meftah Ben-Issa, a Libyan National currently residing in Morocco. Plaintiffs seek both declaratory and injunctive relief against the various defendants to the effect that the defendants' refusal to grant Mr. Ben-Issa an immigrant visa was unauthorized by section 212(a)(27) and (28)(F) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1182(a)(27) and (28)(F), and violated plaintiffs' constitutional rights under the first and fourteenth amendments to the U.S. Constitution, and an order directing defendants to issue Mr. Ben-Issa an appropriate immigrant visa. Jurisdiction is invoked pursuant to 28 U.S.C. § 1331, 1361, 2201 and 2202; 8 U.S.C. § 1329; and 5 U.S.C. § 702. The case is currently before the court on defendant's motion to dismiss and/or for summary judgment pursuant to 12(b)(5), 12(b)(6) and 56(c) F.R.C.P.

The background of this case is as follows: Mr. Ben-Issa had been a nonimmigrant student resident of the United States for the period from March 1977 until August 1985. At that time, he left the country and apparently returned to Libya to visit his family and discuss his plans for marriage. On January 8, 1986, Mr. Ben-Issa and Ms. Voges Ben-Issa were married in Vienna, Austria. Upon her return to this country, Ms. Voges Ben-Issa filed a petition on behalf of her husband with the INS in Detroit seeking to certify him as an "immediate relative-spouse" pursuant to § 201(b) of the Act, 8 U.S.C. § 1151(b). That petition was approved on January 24, 1986 and forwarded to the United States Consulate in Vienna, Austria. On January 28, 1986, Mr. Ben-Issa submitted an application for an immigrant visa along with supporting documents to the Consul in Vienna. Because the Secretary of State has the general responsibility to supervise the issuance of visas by consular officers, 8 U.S.C. § 1104 and 22 C.F.R. § 41.130, the visa application was reviewed by the State Department. Furthermore, because Mr. Ben-Issa had previously resided in the United States for more than six months, his application was also checked by the FBI. On March 19, 1986, the American Consul in Vienna, Eli N. Lauderdale, notified Mr. Ben-Issa that his visa application had been denied due to a determination that he was ineligible for an immigrant visa under § 212(a)(27) and (28)(F) of the Act.

Section 212(a) identifies numerous "classes" of aliens who are ineligible for visas and therefore excluded from admission into this country. Subsection (27) directs the exclusion of an alien if "the Attorney General knows or has reason to believe that [the alien seeks] to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States." Subsection (28)(F) excludes the entire class of:

**1558**

Aliens who advocate or teach or who are members of or affiliated with any organization that advocates or teaches (i) the overthrow by force, violence, or other unconstitutional means of the Government of the United States or of all forms of law; or (ii) the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers ... of the Government of the United States or of any other organized government, because of his or their official character; or (iii) the unlawful damage, injury, or destruction of property; or (iv) sabotage.

At the preliminary injunction hearing, plaintiffs contended that the determination of ineligibility and subsequent denial of Mr. Ben-Issa's visa application was arbitrary and capricious and amounted to an abuse of discretion. They argued that this denial continues to cause extreme and irreparable harm inasmuch as it keeps the married plaintiffs apart in violation of their constitutional rights and jeopardizes Mr. Ben-Issa's personal safety in the event that he is forced to return to Libya. Plaintiffs also generally contended that they were no more than innocent victims of the present political tensions between the United States and Libya.

After hearing oral argument, I denied plaintiffs' request for a preliminary injunction.

## DISCUSSION

Plaintiffs emphasize that they are not challenging the *decision* of a consular officer which denied Mr. Ben-Issa an immigrant visa, but rather the "constitutionality of Section 1182(a)(27) [and] (28)(F) as applied to these plaintiffs." See Plaintiffs' Response to Defendants' Motion to Dismiss and/or For Summary Judgment at 12. (On the other hand, plaintiffs also argue that in a letter dated March 19, 1986, Mr. Eli N. Lauderdale, Jr., American Consul in Vienna, Austria, informed Mr. Ben-Issa of the State Department's decision to deny him a visa and that it is "[t]his denial decision that forms the basis of the present lawsuit." Plaintiffs' Brief at 2.)

In any event, plaintiffs argue that since Sections (27) and (28) are within subsection II of the Immigration Act, this Court has jurisdiction. *Id.* at 12. In the alternative, plaintiffs suggest that there is jurisdiction pursuant to the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* (A.P.A.) (This latter argument is easily disposed of. It is beyond argument that the A.P.A. does not provide an independent source of subject matter jurisdiction. *Califano v. Sanders*, 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977)).

■ Defendants submit that this Court is without subject matter jurisdiction because under the facts of this case the relevant case law establishes that even narrow judicial review of a consular officer's decision to deny a visa is inappropriate. *See e.g., Ventura-Escamilla v. INS*, 647 F.2d 28, 30 (9th Cir.1981); *Wan Shih Hsieh v. Kiley*, 569 F.2d 1179, 1181 (2d Cir.1978), cert. denied, 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 121 (1978). Under the facts of this case, I agree.

In *Ventura-Escamilla* the Ninth Circuit explained the plenary power of Congress over the admission of aliens.

Essentially the relief sought is a review of the Consul's decision denying [the] application of a visa. Such a review is beyond the jurisdiction of the Immigration Judge, the BIA, and this Court.

The Supreme Court has repeatedly affirmed that the legislative power of Congress over the admission of aliens is virtually complete. (Citations Omitted.) The scope of judicial review is necessarily limited by the recognition that the power to exclude or expel aliens, as a matter affecting international relations and national security is vested in the Executive and Legislative branches of government.... Justice Harlan's statement in *Lem Moon Sing v. United States*, 158 U.S. 538 [15 S.Ct. 967, 39 L.Ed. 1082] (1895) ... still clearly expresses the Court's positions:

The power of Congress to exclude aliens altogether from the United States or to prescribe the terms and

conditions upon which they may come into this country, and to have its declared policy in that regard enforced exclusively through executive officers, *without judicial intervention,* is settled by our previous adjudications. *Id.* at 547 [15 S.Ct. at 970]. From this foundation evolved the doctrine of non-reviewability of a consul's decision to grant or deny a visa....

*Ventura-Escamilla,* supra at 30 (emphasis added). *See also United States v. Kellogg,* 30 F.2d 984, 986 (D.C.Cir.1929), *cert. denied,* 279 U.S. 868, 49 S.Ct. 482, 73 L.Ed. 1005 (1929); *accord Castaneda-Gonzalez v. INS,* 564 F.2d 417, 428 n. 25 (D.C.Cir. 1977).

That is really all there is to it. Plaintiffs attempt to sidestep this line of authority by arguing that they are not challenging the decision of the consul but rather "the constitutionality of Section 1182(a)(27) [and] (28)(F) as applied to these plaintiffs. But in order for me to get to the merits, plaintiffs are permitted to present a challenge to these sections and seek whatever limited judicial review, if any, which may be appropriate *only if* they have standing. I do not believe plaintiffs can clear that hurdle either.

Plaintiffs rely heavily on a recent United States Court of Appeals for the District of Columbia case, *Abourezk v. Reagan,* 785 F.2d 1043 (D.C.Cir.1986). *See also Allende v. Schultz,* 605 F.Supp. 1220 (D.Mass.1985). In *Abourezk v. Reagan* the court found that plaintiffs had been aggrieved by the State Department's resort to Section 1182(a)(27) to keep out people they had invited to engage in face-to-face discourse. The *Abourezk* court noted that the plaintiffs were 'at least arguably in the zone regulated by the statute'. They therefore have a cognizable stake in the *construction* of subsection (27) and (28), a practical interest adequate under Section 702 of the APA to secure judicial review of their pleas regarding those provisions." *Id.* at 1051 (emphasis added).

At the preliminary injunction hearing I indicated that it appeared that under *Abourezk* that Mrs. Ben-Issa *might* have standing to challenge the constitutionality of the consul's decision, but I noted that that was a different question than that of whether she was likely to prevail on the merits. I now believe that there are significant differences between the *Allende, Mandel, Abourezk* line of cases and this case such that neither plaintiff has standing to challenge the constitutionality of Section 1182(a)(27) [and] (28)(F) "as applied".

I said at the time of the preliminary injunction hearing that the difficulties which faced Mrs. Ben-Issa in being reunited with her husband demonstrated that as a practical matter a reasonable person would conclude that she suffered "irreparable injury" within the meaning of one of the four criteria that must be established before an injunction can issue. But that conclusion is different from finding that she suffers from the denial of certain constitutionally cognizable interests which provide her and/or her husband with standing so as to be able to challenge—as plaintiffs have put it—the constitutionality of Section 1182(a)(27) [and] (28)(F) as applied.

■ As applied to whom? It is beyond discussion—and I pointed this out at the preliminary injunction hearing—that Meftah Ben-Issa, as an unadmitted and nonresident alien, has no constitutional right to enter the United States as an immigrant or otherwise. *Kleindienst v. Mandel,* 408 U.S. 753, 762, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972).

■ Well, then does Victoria Voges Ben-Issa, as the spouse of an excluded alien have standing to maintain an action for judicial review of the constitutionality of the statutory basis of the consul's denial? Plaintiffs argue that under *Abourezk v. Reagan* Mrs. Ben-Issa does have standing. In fact, plaintiffs argue that since the decision to deny her alien husband a visa affects certain fundamental rights which *she* has as a U.S. citizen, that the court must subject the State Department's actions to an even *higher* level of scrutiny than that which has been previously applied in *Allende, Mandel,* or *Abourezk.*

Assuming for the moment that plaintiffs' argument is correct, what legal consequences would follow? The outcome would be that a citizen spouse could seek judicial review of the constitutionality of a consular's decision to deny an alien spouse's immigrant visa. Moreover, it would logically follow from plaintiffs' argument that a whole line of cases that have rejected constitutionally-based challenges to immigration decisions which have resulted in the inadvertent separation of families of United States citizens have been wrongly decided.

For example, in *Ayala-Flores v. INS,* 662 F.2d 444, 445 (6th Cir.1981), the Sixth Circuit held that the fact that alien parents are about to be deported does *not* work a *de facto* deportation of their child—who was a U.S. citizen by virtue of being born in this country—in violation of the child's constitutional rights of citizenship. The court went on to also note that "Congress did not give such a child the ability to confer immigration benefits on his parents...." *Ayala-Flores,* 662 F.2d at 445, *quoting Acosta v. Gaffney,* 558 F.2d 1153 (3d Cir.1977).

In the present case, if I were to accept plaintiffs' argument, the result would be that private citizens would be given the power to "create jurisdiction" and thereby challenge a consul's decision by virtue of their marrying an alien outside of this country who is about to apply for a visa. Since the alien spouse could not under his own status as an alien challenge the decision, it would mean that because the citizen spouse has returned to the U.S. that she could then raise "his" challenge for him. To paraphrase the language quoted in *Ayala-Flores,* Congress did not give a citizen spouse the ability to confer immigration benefits on her alien spouse, or the ability to make immigration decisions, or the ability to confer standing to challenge the constitutional basis for the decision to deny a visa.

But I believe that plaintiffs' argument is wrong not only for policy reasons and because it runs against the grain of precedent; it is wrong for another reason. The *Mandel, Abourezk, Allende* line of cases upon which plaintiffs rely to support their standing argument, concerned the first (and fifth) amendment rights of U.S. citizens who had invited alien speakers to this country so that they might—for a limited time—see and hear them express their ideas. The plaintiffs in *Abourezk,* for example, directly challenged the actions of state department officials acting pursuant to Section (27) and (28) which prevented the alien speakers from coming here. The U.S. citizens argued that they, as U.S. citizens, had standing because the State Department's denial of visas to the alien speakers prevented the U.S. citizens from hearing their information and ideas "face-to-face". Put another way, the State Department actions violated the U.S. citizens' first amendment rights of association.

The only real similarity between those cases and the present case is that in *Abourezk,* at least, the same Sections of the immigration laws were at issue. But of course the crux of the narrow remand in the *Abourezk* decision concerned a challenge by aggrieved U.S. citizens over the proper construction of and interplay between Sections 27 and 28 in the context of the legislative history and intent of the McGovern amendment. The Circuit Court never even reached the constitutional questions raised by the plaintiffs but merely found that the plaintiffs enjoyed standing and that the court had jurisdiction.

More important, although Mr. Ben-Issa's application for an immigration visa was denied after it was determined that he was ineligible for entry into the U.S. pursuant to Sections (27) and (28), under 8 U.S.C. § 1104(a)(1) the consular's officer's decision is final. It is equally clear that aliens who are found to fall within one of the 33 categories set forth at 8 U.S.C. § 1182(a) "shall be ineligible to receive visas" their marital status or citizen interest notwithstanding.

Mrs. Ben-Issa surely has been "aggrieved"—within a common sense meaning of that word—by the consul's decision; but under these facts that common sense perception is not enough to confer standing to

challenge the consul's decision or the constitutionality of the statutory basis for that decision. Further, asserting that Mrs. Ben-Issa has been "aggrieved" is different from finding that the consul's decision to deny her alien husband a visa implicated her constitutional rights in such a way that she has standing to challenge the constitutionality of the statutory basis of that decision. Unlike the plaintiffs in *Mandel, Abourezk,* and *Allende,* Mrs. Ben-Issa is not even "arguably ... in the zone regulated by the statute." (I note as an aside that while I think the facts of this case at least imply that the consul's decision was either influenced by information provided it by the State Department or directed by the State Department officials, I do not think— as defendants apparently do—that the distinction between whether it was the consul's decision or the State Department's policy decision, or whether the official who made the decision was on foreign soil or not is what is important here.) Everything rises or falls—as it were—on the question of standing.

I should add that plaintiffs' reliance on *El-Werfalli v. Smith,* 547 F.Supp. 152 (S.D. N.Y.1982) is misplaced. The Libyan student in that case was in this country when he made his challenge. In fact, he was in the custody of the Immigration and Naturalization Service and sought a writ of habeas corpus ordering his release. (It is well-settled that the geographical location of an alien has a dramatic effect on his constitutional status.) "It is well established that if an alien is a lawful permanent resident of the United States *and remains physically present there,* he is a person within the protection of the Fifth Amendment. He may not be deprived of his life, or property without due process of law." *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596, 73 S.Ct. 472, 477, 97 L.Ed. 576 (1953).

Beyond the important difference as to standing between the petitioner in *El-Werfalli v. Smith* and the plaintiffs here, there are other differences as well. On the one hand the *El-Werfalli* court did imply that where standing has been established there may be limited judicial review within the meaning of that phrase established by *Mandel.* On the other hand, however, I would point out while the court noted that "the statute 8 U.S.C. § 1182(a)(27) does not expressly eliminate the very limited judicial review traditionally applied in this area", it also made the observation that the "Government [did not] press its claim that exclusion decisions ... are unreviewable, but rather supplied the Court with unclassified and classified information" to prove its contention that the "Government ... acted 'on the basis of a facially legitimate and bona fide reason'. Government Brief at 16." *El-Werfalli,* 547 F.Supp. at 153.

Here, of course, the defendants have not only *vigorously* pressed their claim that final consular decisions are unreviewable, but the claim that plaintiffs lack standing as well. Defendants have submitted some unclassified documents but have not offered classified documents primarily because of their contention that the consular's decision is unreviewable. Whatever precedential value *El-Werfalli* might have in other contexts, under the facts of the present case it offers little, if any, guidance.

I agree with defendants that this case is controlled by the line of cases which hold that consular determinations are beyond the review of this Court and that the constitutional rights of a citizen spouse are not violated by the consul's denial of her husband's application for a visa. *See Burrafato v. United States Department of State,* 523 F.2d 554 (2d Cir.1975), *cert. denied,* 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976). *See also Noel v. Chapman,* 508 F.2d 1023, 1027–28 (2d Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975); *Silverman v. Rogers,* 437 F.2d 102 (1st Cir.1970), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1667, 29 L.Ed.2d 149 (1971); *Swartz v. Rogers,* 254 F.2d 338 (D.C.Cir.), *cert. denied,* 357 U.S. 928, 78 S.Ct. 1373, 2 L.Ed.2d 1362 (1958).

In *Burrafato,* like the present case, a citizen spouse married a foreign national while out of the country and returned to the United States without her husband. The husband then applied for a permanent

immigration visa which was denied by the consular officer pursuant to 8 U.S.C. § 1182(a). The Second Circuit dismissed the case ruling that it did not have subject matter jurisdiction.

Although plaintiffs' novel constitutional claims are engaging, I believe that the state of the law to have changed little since *Burrafato.*

## CONCLUSION

Mrs. Ben-Issa argues that in reviewing the government's decision to deny her alien husband a visa, this Court should consider the character of the constitutional interest asserted by her—an aggrieved plaintiff who is challenging that decision. Plaintiff has urged this Court to consider her fundamental right to travel, her right to marry, her right to association. But whatever fundamental interests she may have as a U.S. citizen, such interests are distinct from those of her husband who as an alien not within the borders of the U.S. has no constitutional interest. Moreover, her interests are not in a constitutional sense, implicated by the denial of a visa to her alien husband.

I note, in passing, that even a U.S. citizen's right to travel is not absolute. For example, the Supreme Court has upheld restrictions on American citizens travelling to foreign countries. See *Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). *A fortiori,* the government has the power to prevent citizens from other countries from travelling to this country even where the purpose is to be re-united with their relatives.

Mrs. Ben-Issa is in effect arguing that her constitutional interests should prevail where the government has not asserted any countervailing good reason for refusing her husband a visa. But as we have seen, the power to exclude in this instance is in theory and practice a plenary one.

Plaintiffs argue that the statutory discretion in these matters is not absolute. To the extent that some limited judicial scrutiny may be available and under certain circumstances appropriate, plaintiffs' assertion may be technically true, yet attempting to apply even limited scrutiny to cases such as this one demonstrates the practical limitations in exercising judicial review of essentially political decisions. The Court is not untroubled by the potential for abuse that such unbridled discretion gives to the executive branch; however, the fact of the matter is that even where standing is established, the *Mandel* standard provides for very limited judicial scrutiny of such decisions.

This plenary power of the coordinate branches to exclude aliens may appear unfair to Mrs. Ben-Issa especially in view of the fact that her husband lived here for some six years before returning, to his homeland, to visit his family. It may be of little solace to Mrs. Ben-Issa that in the immigration area, especially that of the admission of aliens, history harbors harsh precedents.

In a late nineteenth century case often cited as *The Chinese Exclusion Case,* a group of Chinese laborers left this country with a certificate issued under a congressional act—in essence, a statutory promise that they would be allowed to return. A later statute was passed which prohibited them from returning. That later statute was attacked as violating certain treaties between the United States and China in violation of rights vested in the Chinese laborers by the previous Acts. Speaking for a *unanimous* court, Justice Field held that the "last expression of the sovereign must control." *Chae Ping v. United States,* 130 U.S. 581, 600, 9 S.Ct. 623, 628, 32 L.Ed. 1068 (1889).

Justice Field went on to discuss the power of Congress to exclude aliens.

[These Chinese laborers who seek to return to the United States] are not citizens of the United States; they are aliens.... That the government of the United States, through the action of the legislative department, can exclude aliens from its territory is a proposition which we do not think open to controversy.... The power of the government to exclude foreigners from the country whenever, in its judgment, the public in-

terest requires such exclusion, has been asserted in repeated instances, and never denied by the executive or legislative departments.

*Id.* at 603, 9 S.Ct. at 629.

Treatise writers have observed that "[t]he broad power to exclude aliens has not been weakened by more recent Supreme Court decisions, though several justices have dissented from this position." Nowak, Rotunda, Young, *Constitutional Law*, 2d Ed. Ch. 20 § 11, at 1083 (1983).

In more modern times, the seeds of what appear to be unenlightened, "blanket exclusion" policies have often born bitter fruit for those seeking individual relief from and review of those policies.

In *Shaughnessy v. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953) the Supreme Court upheld the exclusion of an alien who had spent some twenty-five years in this country prior to returning to Rumania to visit his dying mother. However, he never made it to his homeland. He was denied entry in Rumania and spent some nineteen months in Hungary trying to secure an exit permit. After finally securing a quota immigration visa from the American Consul in Budapest, he went to France where he finally set sail for New York, arriving in New York some nineteen months after his journey had begun.

An immigration inspector temporarily excluded him and after reviewing the evidence, the Attorney General ordered the temporary exclusion made permanent without a hearing before a board of special inquiry on the "basis of information of a confidential nature, the disclosure of which would be prejudicial to the public interest." *Id.* at 208, 73 S.Ct. at 627. That determination rested on a finding that respondent's entry would be prejudicial to the public interest for security reasons.

The court refused to review the basis of the Attorney General's decision:

... because the action of the executive officer under such authority is final and conclusive, the Attorney General cannot be compelled to disclosed the evidence underlying his determinations in an exclusion case; it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government. ...

*Id.* at 212, 73 S.Ct. at 629.

The court went on to observe and—I reflect on its words with more than passing irony now given this past summer's unabashed and unequivocal celebration of and salute to the Spirit of Liberty—that not all those who landed on Ellis Island became U.S. residents or citizens—and even those who may have resided here once, were not for that reason alone allowed to stay; or once they left, allowed to return.

You see Mr. Shaughnessy's problems did not end when he was denied entry. The U.S. tried numerous times to ship him back to Great Britain, France, and Hungary. More than a dozen Latin American countries rejected him. The court reflected that "respondent sat on Ellis Island because this country shut him out and others were unwilling to take him in." *Id.* at 345 U.S. 209, 73 S.Ct. 627.

... Neither [Mr. Shaughnessy's] harborage on Ellis Island nor his prior residence here transforms this into something other than an exclusion proceeding. Concededly, his movements are restrained by authority of the United States, and he may by habeas corpus test the validity of his exclusion. But that is true whether he enjoys temporary refuge on land (cites omitted) or remains continuously aboard ship (cites omitted). *For purposes of the immigration laws, moreover, the legal incidents of an alien's entry remain unaltered whether he has been here once before or not. He is an entering alien just the same, and may be excluded if unqualified for admission under existing immigration laws.* (citations omitted) (emphasis added).

*Id.* at 213, 73 S.Ct. at 629.

Finally, even assuming that I had found that this Court has subject matter jurisdiction and that the plaintiffs have standing, as I indicated at the preliminary injunction hearing, I would still have to find that

under *Mandel,* the defendants must prevail on the merits. The Supreme Court has directed that "when the Executive exercises this [exclusion] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." 408 U.S. at 770, 92 S.Ct. at 2585. I believe those words still control the outcome of this case.

The enlightened dissent of Justice Marshall, joined in by Justice Brennan, in *Mandel* highlights the factual differences between the present case and *Mandel* even as it emphasizes its narrowly circumscribed holding. Justice Marshall noted the following:

> I do not mean to suggest that simply because some Americans wish to hear an alien speak, they can automatically compel even his temporary admission to our country. Government may prohibit aliens from even temporary admission if exclusion is necessary to protect a compelling governmental interest (footnote omitted). Actual threats to the national security, public health needs, and genuine requirements of law enforcement are the most apparent interests that would surely be compelling. [But Dr.] Mandel's visit was to be temporary.... The only governmental interest in [the section under which he was excluded] is the Government's desire to keep certain ideas out of circulation in this country.... By now deferring to the Executive, this Court departs from its own best role as the guardian of individual liberty in the face of governmental overreaching. Principles of judicial restraint designed to allow the political branches to protect national security have no place in this case. Dr. Mandel should be allowed to make his brief visit.

*Mandel,* 408 U.S. at 784, 785, 92 S.Ct. at 2592, 2593.

Under the facts of this case, plaintiffs' assertion that the court should engage in the process of balancing their constitutional interests against the government's interest in implementing its immigration policy is simply without legal basis in the wake of *Mandel, supra.*

Consequently, defendants' motion to dismiss plaintiffs' complaint pursuant to FRCP 12(b)(1) is GRANTED.