Hortensia de ALLENDE, et al., Plaintiffs,

v.

George P. SHULTZ, Secretary of State, et al., Defendants.

Civ. A. No. 83–3984–C.

United States District Court, D. Massachusetts.

March 13, 1989.

Rabinowitz, Boudin, Standard Krinsky & Lieberman, P.C., Leonard B. Boudin, Edward Copeland, New York City, Allan R. Rosenberg, Putnam, Bell & Russell, Boston, Mass., for plaintiffs.

Evan Slavitt, Asst. U.S. Atty., Boston, Mass., Robert L. Bombaugh, Thomas W. Hussey, David V. Bernal, Office of Immigration Litigation, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM

CAFFREY, Senior District Judge.

The action currently before the Court, concerning the plaintiffs' timely application for attorneys' fees, has its roots in litigation that began in 1983, when United States Under Secretary of State Lawrence Eagleburger denied a nonimmigrant tourist visa requested by the plaintiff, Hortensia de Allende, widow of slain Chilean President Salvatore Allende. Mrs. Allende applied for the visa after receiving several invitations to address university and community groups in the United States. The Under Secretary of State denied the visa based on section 212(a)(27) of the Immigration and Nationality Act, codified at 8 U.S.C. § 1182(a)(27).

The American plaintiffs, with Mrs. Allende serving as "symbolic plaintiff," filed suit challenging this decision. In a series of decisions over the course of five years, plaintiffs repeatedly prevailed against the defendants. *See Allende v. Shultz,* 605 F.Supp. 1220 (D.Mass.1985) (defendants' motion for summary judgment denied); *Allende v. Shultz,* 624 F.Supp. 1063 (D.Mass. 1985) (defendants' motion to dismiss for mootness denied); *Allende v. Shultz,* Civ. No. 89–3984, 1987 WL 9764 (D.Mass. Mar. 31, 1987) (1987 U.S.Dist. Lexis 2798), *aff'd,* 845 F.2d 1111 (1st Cir.1988) (defendants' renewed motion for summary judgment de-

nied; plaintiffs' cross motion for summary judgment allowed).

Plaintiffs now seek attorneys' fees and costs against the United States totalling over $150,000 pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d). The government opposes the application.

As we consider the plaintiffs' application for fees, we must steer a difficult middle course between the Supreme Court's admonition that a "request for attorney's fees should not result in a second major litigation," *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) (quoted in *Pierce v. Underwood,* —— U.S. ——, 108 S.Ct. 2541, 2549, 101 L.Ed.2d 490 (1988), and *Grendel's Den v. Larkin,* 749 F.2d 945, 951 (1st Cir.1984)), and the statutory instruction that our decision concerning fee awards under the EAJA "shall be determined on the basis of the record … which is made in the civil action for which fees and other expenses are sought." 28 U.S.C. § 2412(d)(1)(B). As briefly as possible, therefore, we summarize the law, the record of the case at bar, and our decision that the award of attorneys' fees is appropriate in this case.

1. *The Equal Access to Justice Act Standard: "Substantial Justification"*

The United States Congress enacted the EAJA in 1980 in order to "encourage relatively impecunious private parties to challenge abusive or unreasonable governmental behavior by relieving such parties of the fear of incurring large litigation expenses." *Sierra Club v. Secretary of the Army,* 820 F.2d 513, 516 (1st Cir.1987) (quoting *United States v. 1,378.65 Acres of Land,* 794 F.2d 1313, 1315–16 (8th Cir.1986)). Congress intended "to ensure that [private parties] will not be deterred from seeking review of, or defending against, unjustified governmental action because of the expense involved in securing the vindication of their rights." *Miles v. Bowen,* 632 F.Supp. 282, 283 (M.D. Ala.1986) (quoting H.R.Rep. No. 120, 99th Cong., 1st Sess. 4, *reprinted in* 1985 U.S. Code Cong. & Admin.News 132, 132–33).

The EAJA's purpose is to shift litigation expenses to the United States when the prevailing party has contested "unreasonable government action," *Meyers v. Heckler*, 625 F.Supp. 228, 231 (S.D.Ohio 1985), and to "permit fee awards against the United States to the same extent they may be awarded against a private party at common law." *Sprague v. Heckler*, 619 F.Supp. 1289, 1295 (D.Me.1985).

It goes almost without saying that the EAJA modifies the American Rule that each party in litigation bears its own costs, *see Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), and creates a limited waiver of the common law doctrine of sovereign immunity. *Lane v. United States*, 727 F.2d 18, 20–21 (1st Cir.), *cert. denied*, 469 U.S. 829, 105 S.Ct. 113, 83 L.Ed.2d 57 (1984). It is our duty, therefore, to construe the statutory language narrowly. *Id.*

The relevant portion of the EAJA provides that:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses ... incurred by that party in any civil action ..., including proceedings for judicial review of agency action ... unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(a)(1)(A). The threshold statutory considerations are therefore three: a) whether the plaintiffs qualify as "prevailing parties"; b) whether the agency action here at issue—the State Department's decision to deny a visa to Mrs. Allende in 1983—was "substantially justified"; and c) whether "special circumstances" exist in this case that would make an award of attorneys' fees "unjust." We consider each requirement in turn.

### A. "The Prevailing Party"

■ There can be no serious argument that the plaintiffs prevailed at every step of this litigation. In interpreting similar language in 42 U.S.C. § 1988, the Supreme Court has explained that a "typical formulation is that 'plaintiffs may be considered "prevailing parties" for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978)). Although it is true, as defendants argue, that a litigation scorecard would reveal that plaintiffs did not win every point they advanced in this protracted litigation, a scorecard is not the proper method for determining whether a party has prevailed under the EAJA. Instead, "a court should look 'to the substance of the litigation' to determine whether an applicant has substantially prevailed in its position." *Chapoose v. Hodel*, 831 F.2d 931, 936 (10th Cir.1987) (quoting *Devine v. Sutermeister*, 733 F.2d 892, 898 (Fed.Cir.1984)). This examination should be a "pragmatic factual inquiry" into the record. *Id.* (quoting *Clark v. Los Angeles*, 803 F.2d 987, 989 (9th Cir.1986)). As the *Devine* court so aptly explained, "[i]n effect, substance should prevail over form." 733 F.2d at 898.

In substance, plaintiffs prevailed. While the government argued to the contrary, we first found standing, jurisdiction, no "facially legitimate and bona fide" reason for excluding Mrs. Allende, no factual basis for the government's position that Mrs. Allende's presence in the United States "would have been prejudicial to the conduct of the foreign affairs of the United States," and denied the government's motion to admit classified documents for *in camera ex parte* inspection. *Allende v. Shultz*, 605 F.Supp. 1220 (D.Mass.1985). We then found that the government's decision to issue Mrs. Allende a single entry visa in December 1985 did not render the case moot, as the government argued. *Allende v. Shultz*, 624 F.Supp. 1063 (D.Mass. 1985). And finally, we granted summary judgment for the plaintiffs, a decision affirmed by the First Circuit Court of Appeals. *Allende v. Shultz*, Civ. No. 83–3984 (D.Mass. Mar. 31, 1987), *aff'd*, 845 F.2d 1111 (1st Cir.1988). Our pragmatic factual

inquiry into the record finds ample support for our conclusion that plaintiffs qualify as prevailing parties within the meaning of section 2412(d)(1)(A) of the EAJA.

### B. "Substantially Justified"

■ The more difficult inquiry focuses on whether the government's position—its decision to deny Mrs. Allende's visa application on the basis of section 212(a)(27) of the Immigration and Nationality Act—was "substantially justified." Not surprisingly, this term has generated a great deal of judicial attention since 1980. More surprisingly, the courts of appeal have spoken with an almost unanimous voice in defining the term:

> All of the circuits, except the District of Columbia Circuit, agree that the test for determining whether the government's position was "substantially justified" is one of reasonableness; was the government's position reasonable both in law and fact.

*United States v. Yoffe,* 775 F.2d 447, 449 (1st Cir.1985) (and cases cited therein). The Supreme Court explained the term in this way:

> "Substantially justified" is the test the statute prescribes, and the issue should be framed in those terms ... We are of the view, therefore, that as between the two most commonly used connotations of the word "substantially," the one most naturally conveyed by the phrase before us here is not "justified to a high degree," but rather "justified in substance or in the main"—that is, justified to a degree that could satisfy a reasonable person.

*Pierce v. Underwood,* 108 S.Ct. at 2549–50. The government bears the burden of proof in this matter, and this burden is described as follows:

> The government has the burden of proving substantial justification by a preponderance of the evidence ... In order to carry the devoir of persuasion, the government must show that it had a reasonable basis for the facts alleged, that it had a reasonable basis in law for the theories it advanced, and that the former supported the latter.

*Sierra Club v. Secretary of the Army,* 820 F.2d 513, 517 (1st Cir.1987) (citing *United States v. Yoffe,* 775 F.2d at 450).

In order to determine whether the government's action was justified in substance or in the main so as to satisfy a reasonable person, we must examine the state of the law in 1983 and determine how reasonable minds at that time viewed section 212(a)(27), 8 U.S.C. § 1182(a)(27), and determine whether the government has met its burden.

#### i) *The Act*

Title 8 U.S.Code, Section 1182 sets forth the detailed and comprehensive federal law governing "excludable aliens." The statute provides that "[e]xcept as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission to the United States:"

> Aliens who the consular officer or the Attorney General knows or has reason to believe seek to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States.

8 U.S.C. § 1182(a)(27). Subsection 28 provides for the exclusion of:

> Aliens who are, or at any time have been, members of any of the following classes:
> (C) Aliens who are members of or affiliated with ... the Communist or any other totalitarian party of any State of the United States, of any foreign state, or of any political or geographical subdivision of any foreign state.....

*Id.* § 1182(a)(28).

When read in the context of the entire statute and especially when compared to subsection 28, it is clear that the statute contemplates at least two types of exclusion: *entry* or *status* exclusion as defined by subsection 28, and *activity* or *conduct* exclusion as defined by subsection 27. See discussion in *Abourezk v. Reagan,* 592 F.Supp. 880, 883–86 (D.D.C.1984); *Allende v. Shultz,* 845 F.2d 1111, 1116 (1st Cir. 1988). Thus an alien may be excluded un-

der subsection 28 simply for being a member of or affiliated with a communist or totalitarian organization, while subsection 27 permits exclusion only when the government expects the alien to engage in certain activities within our borders after entry. This much is evident simply from the face of the statute.

In 1983, decisional law concerning subsection 27 was sparse and direct challenges to subsection 27 exclusions were rare. The early cases primarily addressed jurisdictional and standing issues, *see e.g., Burrafato v. Department of State*, 523 F.2d 554 (2d Cir.1975), *cert. denied*, 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976); *Gilroy v. Ferro*, 534 F.Supp. 321 (W.D.N.Y.1982); *Soroa–Gonzales v. Civiletti*, 515 F.Supp. 1049 (N.D.Ga.1981); *United States v. Belimex Corp.*, 340 F.Supp. 466 (S.D.N.Y.1971); *Younus v. Shabat*, 336 F.Supp. 1137 (N.D. Ill.1971).

More important than these early cases, however, are two other landmarks in the legal landscape in 1983. First, and most importantly, is the Supreme Court's decision in *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). There the Court recognized that the decision to exclude an alien based on subsection 28 (activity or conduct exclusion) may implicate the First Amendment free speech and associational rights of United States citizens. *Id.* at 762–70, 92 S.Ct. at 2581–86. The Court also made clear that "when the Executive exercises this power [to exclude aliens] on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." *Id.* at 770, 92 S.Ct. at 2585. We are not alone in interpreting this language to permit judicial review of decisions to exclude aliens pursuant to subsection 28 when the government has *not* provided a "facially legitimate and bona fide reason" for its action. *See, e.g., Burrafato v. Department of State*, 523 F.2d 554 (2d Cir.1975); *NGO Comm. on Disarmament v. Haig*, No. 82–3636 (S.D.N.Y. June 10, 1982).

Second, in 1979 Congress enacted the so-called McGovern Amendment, which provides:

> For purposes of achieving greater United States compliance with [the Helsinki Accords] and for purposes of encouraging other signatory countries to comply with those provisions, the Secretary of State should, within 30 days of receiving an application for a nonimmigrant visa by any alien who is excludible from the United States by reason of membership in or affiliation with a proscribed organization but who is otherwise admissible . . ., recommend that the Attorney General grant the approval necessary for the issuance of the visa to such alien, unless the Secretary determines that the admission of such alien would be contrary to the security interests of the United States. . . .

22 U.S.C. § 2691(a). The McGovern Amendment thus directs a waiver of subsection 28 exclusion unless the nation's "security interests" are implicated.

One final matter enters into our analysis. In 1983, the Department of State's own Foreign Affairs Manual contained the following instructions concerning subsection 27:

> It was the intent of Congress that the provisions of paragraph (27) of Section 212(a) of the [Immigration and Nationality] Act be used to safeguard the security of the United States. They must not be used as "catch-all" provisions for refusing visas in all cases which do not fit in other paragraphs of Section 212(a).

9 Foreign Affairs Manual, Visa TL–880 ¶ 1 (quoted in *Allende v. Shultz*, 605 F.Supp. at 1225).

On the basis of the information available to the Secretary of State and the state of the law in 1983, was the decision to deny Mrs. Allende's visa pursuant to subsection 27 "justified in substance or in the main"? *Pierce v. Underwood*, 108 S.Ct. at 2550. We think not.

ii) *The Government's Position*

The government cited two reasons for denying Mrs. Allende's visa application: 1)

her membership in the World Peace Council and the Women's International Democratic Federation, two organizations allegedly affiliated with the Communist Party of the Soviet Union, and 2) the government's determination that her admission to the United States was "for the purpose and during the period specified in the application would have been prejudicial to the conduct of the foreign affairs of the United States." *Allende v. Shultz*, 624 F.Supp. at 1065. While these reasons may be sufficient cause for exclusion pursuant to subsection 28, the status exclusion provision addressed in *Kleindienst, supra,* they are, at best, unusual reasons for exclusion pursuant to subsection 27, the activities provision.

As *Allende* made its way through the First Circuit from 1985 to 1988, a strikingly similar case followed a similar route in the District of Columbia Circuit. *Abourezk v. Reagan*, 592 F.Supp. 880 (D.D.C.1984) (executive provided "facially legitimate" reasons for excluding aliens; government's motion for summary judgment granted), *vacated and remanded*, 785 F.2d 1043 (D.C.Cir.1986) (government may bypass subsection 28 and proceed under subsection 27 only if alien's threat to public interest or safety is independent of fact of membership in proscribed organization), *aff'd without opinion by equally divided court*, 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987), *remanded*, Civ. Nos. 83–3739, 83–3741, 83–3895, 1988 WL 59640 (D.D.C. June 7, 1988) (1988 U.S. Dist. LEXIS 5203) (plaintiffs' motion for summary judgment granted; government ordered to issue appropriate entry visas to aliens). In *Abourezk*, the District of Columbia Circuit ultimately came to the same decision reached by the First Circuit:

> If the government could use subsection (27) to exclude aliens whose entry might threaten our foreign policy objectives simply because of their membership in Communist organizations, then subsection (28) would be made superfluous and the congressional will expressed in the McGovern Amendment would be nullified. Conversely, the restrictions on subsection (28) must not be read in a fashion

that would rob subsection (27) of its independent scope and meaning. To preserve the significance of both sections, and the congressional intent that guided their adoption, the two sections must not be homogenized or treated as interchangeable parts.

*Id.* at 1057.

Although the government argued that its use of subsection 27 to deny visas in both *Allende* and *Abourezk* was not unreasonable because its position found support in District Court Judge Green's initial opinion in *Abourezk*, in Judge Bork's dissent in the appellate ruling, in the equally divided Supreme Court panel, and in various legislative proposals now before Congress, we are not persuaded. Although we disagree with this reading of the *Abourezk* litigation, the argument is irrelevant because the *Pierce v. Underwood* standard is clear: the government's position must be substantially justified in law and fact. In denying Mrs. Allende's visa application pursuant to subsection 27, it is clear to this Court that the government was attempting an "end run" around subsection 28, and the McGovern Amendment waiver. The government's interpretation of subsection 27 not only contravenes its plain meaning, *Allende v. Shultz*, 845 F.2d at 1116–17, but it also subverts the will of Congress, *Abourezk v. Reagan*, 785 F.2d at 1057, and it uses the statute in a manner precisely prohibited by the State Department's own Foreign Affairs Manual. There is scant legal or factual basis for the government's position.

### C. "Special Circumstances"

The EAJA permits the government to advance good faith, credible and novel interpretations of the law. *Jackson v. Bowen*, 807 F.2d 127 (8th Cir.1986); *Brinker v. Guiffrida*, 798 F.2d 661 (3d Cir.1986). The statute specifically recognizes that "special circumstances" may make an award of attorneys' fees unjust, and courts have interpreted this language to permit consideration of the "novel legal theory" argument. *Brinker*, 798 F.2d at 668; *Trahan v. Regan*, 824 F.2d 96, 104–05 (D.C.Cir.1987).

The legislative history of section 2412(d)(1)(A) provides that:

The "special circumstances" provision is a "safety valve" designed to "insure that the Government is not deterred from advancing in good faith the novel but credible extensions and interpretations of the law that often underlie vigorous enforcement efforts" and to protect the court's discretion to rely on "equitable considerations" in denying a fee award.

*Trahan v. Regan,* 824 F.2d at 104 (quoting H.R.Rep. No. 96–1418 at 11, 1980 U.S.Code Cong. & Admin.News 4953, 4990).

We need not tarry long on this matter. As the District of Columbia Circuit has noted, the district courts do not "have an affirmative duty in each and every case to set forth reasoning on the special circumstances issue," especially if it is not a "major part" of the government's argument. *Grano v. Barry,* 783 F.2d 1104, 1112 (D.C. Cir.1986). As the government devotes only a paragraph to the special circumstances argument in the case at bar, we need only state that we find no special circumstances that would make an award unjust in *Allende.*

### 2. *The Record*

One indicia of the reasonableness of the government's position is the reception it received in the courts. Although we certainly recognize that a reasonable and substantially justified argument may not prevail in a particular case and that prevailing parties are not *per se* entitled to attorneys' fees, our earlier holdings also shed light on the state of the law at the time the State Department denied Mrs. Allende's visa application.

From the outset it is clear that the government's arguments rested on a shaky foundation. We described the argument that plaintiffs lacked standing as "soundly rejected" by the Supreme Court. *Allende,* 605 F.Supp. at 1223 (citing *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972)). We described the government's second reason for excluding Mrs. Allende—the "prejudicial effect" of her mere presence in the United States—as

"entirely conclusory." *Allende,* 605 F.Supp. at 1225. We also described the government's argument as based on "vague notions of foreign policy" that "do not provide a sufficient basis for invocation" of subsection 27. *Id.* We also noted that the government's attempt to introduce classified information for *in camera ex parte* examination violated well-established First Circuit law. *Id.* at 1226.

In considering the government's motion to dismiss for mootness, we noted that [t]he plaintiffs, *contrary to the defendants' contentions,* are not merely seeking an order compelling the defendants to grant Mrs. Allende the visa that was denied her ...; rather, they are seeking a declaration that the defendants' policy of applying Section (a)(27) ... is unlawful.

*Allende,* 624 F.Supp. at 1066 (emphasis added). Even stronger language followed:

I rule that the defendants have failed to carry their heavy burden with respect to the first criteria of the *[Los Angeles v.] Davis* test [440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979), concerning whether there is a reasonable expectation that the alleged violation will recur] ...

*Id.* On appeal, the First Circuit stated that "[w]e agree that the government has failed to advance a sound basis for exclusion under subsection 27." *Allende,* 845 F.2d at 1116. In rejecting the government's interpretation of subsection 27, the court stated:

The language of subsection 27 *clearly* articulates the scope of the provision ... [and] establishes *clear* criteria for exclusion ...

[T]he statute makes clear the anticipation of post-entry activity as a prerequisite to exclusion. We simply fail to see how an alien can enter to engage in the act of entry. Reading the disputed language out of the provision would violate established principles of statutory construction ...

In the instant case, Congress *clearly* distinguished between exclusion based on an alien's identity and exclusion based on an alien's activity. To disregard that

distinction would undercut the clear meaning of the statute.

*Id.* at 1117 (emphasis added; footnote omitted). And further:

> The spectre raised by defendant, therefore, of a government stymied by a restrictive interpretation of subsection 27 *has no merit.*

*Id.* at 1118 (emphasis added). The record establishes that neither this Court not the Court of Appeals found the government's position reasonable or substantially justified.

### 3. *The Fee's Application*

■ One of the leading cases in American jurisprudence concerning the award of attorneys' fees comes out of the First Circuit Court of Appeals. *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945 (1st Cir.1984), addressed the attorneys' fees provision of 42 U.S.C. § 1988, but its comprehensive and well-reasoned analysis guides our consideration of a similar statutory provision in the EAJA, at issue in this case. *Grendel's Den* articulated several important principles relevant here: a district court should examine the fee application using the "lodestar" approach; each attorney's records should be carefully scrutinized and unnecessary or duplicative hours deleted from the award; the lack of contemporaneous time records requires a substantial reduction in the fees requested; an hourly rate of $275 for a nationally-recognized legal scholar is excessive; itemized expenses, including reasonable costs for travel and room and board, may be awarded; and an award for the fees and costs associated with preparing and arguing a fee application is permissible. *Id.*

In carefully reviewing the fee application, it is clear that plaintiffs followed the dictates of *Grendel's Den.* After scrutinizing the affidavits and timesheets submitted by the five attorneys (Boudin, Rosenberg, Whiteside, Copeland, and Gross), we find no duplicative work, excessive hours on any single project, or any padding of any sort. Mr. Rosenberg and Mr. Whiteside both averaged approximately eleven hours per year for each year of the litigation; Mr. Boudin averaged 100 hours; Mr. Copeland and Mr. Gross (both associates in Mr. Boudin's firm) averaged 68 and 47 hours, respectively. These hours are well within a reasonable "lodestar" figure. Only Mr. Rosenberg requested costs, although it is clear that each attorney incurred mail, telephone, photocopying, and travel expenses and that the statute permits their recovery.

Each attorney also placed a modest cap on his hourly rate. The EAJA provides that "fees shall not be awarded in excess of $75 per hour, unless the court determines that an increase in the cost of living or a special factor ... justifies a higher award." 28 U.S.C. § 2412(d)(2)(A). Courts routinely recognize cost of living increases in the $75/hour rate, and a recent case awarded $91.30/hour because of inflation since 1981, when the statute was enacted. *Union of Concerned Scientists v. United States Nuclear Regulatory Commission,* 840 F.2d 957, 959 (D.C.Cir.1988).

Although there is some discrepancy in the record,[1] Mr. Rosenberg seeks an average of approximately $91/hour for his work; Mr. Whiteside seeks $85/hour for all of his work; and Mr. Copeland and Mr. Gross each seek $88/hour for their work. We note that the bulk of the work done on this case by the various attorneys was performed during 1986 and 1987, and these four attorneys have limited their hourly rate request to an amount this Circuit considered fair in 1986. *Sierra Club v. Marsh,* 639 F.Supp. 1216, 1222 (D.Me.1986), *aff'd sub nom., Sierra Club v. Secretary of the Army,* 820 F.2d 513 (1st Cir.1987). We find these rates reasonable.

■ Mr. Boudin has requested a higher rate of $175/hour based on his special ex-

---

1. Mr. Rosenberg's affidavit states that he seeks $115/hour for 12 hours and $85/hour for the remaining 44.2 hours of his work on this case. The plaintiffs' Memorandum, however, sets these amounts at $88/hour and $85/hour, respectively. Because Mr. Rosenberg signed the affidavit and not the Memorandum, we are inclined to believe he simply did not have the opportunity to correct this error. As the discrepancy totals only $749, we will proceed with the higher rates requested in the affidavit.

pertise as a constitutional law scholar and litigator. He bases this rate on that awarded another constitutional scholar, Professor Lawrence Tribe, in *Grendel's Den* in 1984, and has not requested an adjustment for inflation. We find this rate reasonable and permissible under the "special factor" language of the statute.

█ The government voices several specific objections to the application. First, the government argues that no award should be made for any legal argument, no matter how minor, the plaintiffs advanced but did not succeed on, and argues that the application is deficient because the plaintiffs have not differentiated their work on successful versus unsuccessful claims. This argument has fallen on deaf ears in most courts. As the Supreme Court framed the issue:

> In other cases the plaintiff's claim for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Hensley v. Eckerhart,* 461 U.S. at 435, 103 S.Ct. at 1940 (quoted in *Sierra Club v. Marsh,* 639 F.Supp. at 1220). When focusing on the proper subject—the *Allende* litigation as a whole and the relief obtained— we find no basis for the government's insistence on a claim-by-claim accounting. Certainly the plaintiffs advanced arguments that we did not reach, such as striking the statute as unconstitutional, but it is our duty to avoid deciding a case on constitutional grounds when other narrower grounds are available.

█ The government also argues that there should be no increase in the $75/hour statutory cap. As we noted above, courts routinely recognize cost of living increases in modifying the $75/hour rate authorized by the statute. The authority to do this is expressly granted by the statute, which recognizes "an increase in the cost of living" as a reason to permit a higher rate. We find the rates requested reasonable. The government also argues that no fees or costs should be awarded for any work connected with either Mrs. Allende directly, as she served merely as a symbolic plaintiff, or with the *Abourezk* litigation in the District of Columbia Circuit. Common sense dictates that some contact with Mrs. Allende was necessary, as it was the State Department's treatment of her visa application that forms the basis of this suit. We therefore find Mr. Boudin's one trip to Mexico to confer with Mrs. Allende a reasonable action. We also find Mr. Boudin's monitoring of the *Abourezk* litigation a reasonable component of his work on *Allende.* We note, however, that Mr. Boudin apparently has requested fees for "work" on the *Abourezk* litigation. We have no authority to consider fees incurred for work on that case—Mr. Boudin must submit his application to the D.C. Circuit if he wishes reimbursement. We have, therefore, reduced the hours listed on Schedule D by two-thirds to reflect what we consider is a reasonable amount for monitoring tnat litigation.

█ The government raises another concern. Both Mr. Boudin and Mr. Copeland request fees based in part or whole on reconstructed time records. In the wake of *Grendel's Den,* we have a duty to reduce awards based on reconstructed records. In this application, however, we see no need to take such "draconian" measures. *Action on Smoking & Health v. Civil Aeronautics Board,* 724 F.2d 211, 220 (D.C.Cir. 1984). Both Mr. Boudin and Mr. Copeland state that they have conservatively estimated the reconstructed hours and followed the *Grendel's Den* requirements to the letter. Given their efforts to do so and the overall reasonableness of the application, we see no need to further reduce their award.

In sum, therefore, we find the following hours and rates reasonable for each attorney:

| | |
|---|---|
| Leonard Boudin: | 536.8 hours at $175/hour |
| Allan Rosenberg: | 12 hours at $115/hour |
| | 44.2 hours at $85/hour |
| | costs of $149.55 |
| Alexander Whiteside: | 56.2 hours at $85/hour |
| Edward Copeland: | 340.15 hours at $88/hour |
| Terry Gross: | 140.7 hours at $88/hour |
| Total award: | $146,318.35 |

We believe this award is fair and reasonable, particularly in view of such recent decisions as *Haitian Refugee Center v. Meese*, 791 F.2d 1489, *partially vacated*, 804 F.2d 1573 (11th Cir.1986), where the Court of Appeals affirmed an award of attorneys' fees and costs totalling $441,-094.98 under the EAJA.

The plaintiffs' application for attorneys' fees and costs should be allowed, as modified.

Order accordingly.